UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIGETTE LOWE,<br><br>  Plaintiff,<br><br>  v.<br><br>EDGEWELL PERSONAL CARE COMPANY,<br><br>  Defendant. | Case No. 23-cv-00834-AMO<br><br>**ORDER GRANTING MOTIONS TO DISMISS, DENYING AS MOOT REQUESTS FOR JUDICIAL NOTICE; DENYING AS MOOT MOTION FOR LEAVE TO RESPOND TO NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Re: Dkt. Nos. 37, 38, 55 |
| SARAHA MACK, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>EDGEWELL PERSONAL CARE COMPANY,<br><br>  Defendant. | Related Case No. 23-cv-00837-AMO<br><br><br><br>Re: Dkt. Nos. 38, 39, 56 |

These related putative class actions against Edgewell Personal Care Company concern two different tampon product lines: o.b. Organic™ tampons and Playtex Gentle Glide tampons. *Lowe* Am. Compl. (ECF 34) ¶ 1 n.1; *Mack* Am. Compl. (ECF 32) ¶ 1. The gravamen of each complaint is that the tampons contain harmful "per and polyfluoroalkyl substances ('PFAS')," otherwise known as "forever chemicals," rendering various representations about the products false and misleading. *Lowe* Am. Compl. ¶¶ 10, 48, 94-119; *Mack* Am. Compl. ¶¶ 10, 49, 94-120. In each case, Edgewell filed a motion to dismiss and a request for judicial notice. *Lowe* Mot. (ECF 37),

*Lowe* RJN (ECF 38); *Mack* Mot. (ECF 38), *Mack* RJN (ECF 39).[1] The motions are fully briefed and suitable for disposition without argument pursuant to Civil Local Rule 7-1(b). Accordingly, the Court VACATES the hearing currently set for January 18, 2024. Having considered the parties' papers, the relevant legal authority, and good cause appearing, the Court GRANTS Edgewell's motions to dismiss, DENIES AS MOOT the accompanying requests for judicial notice, and DENIES AS MOOT Plaintiffs'[2] requests for leave to respond to supplemental authority.

# I. BACKGROUND

## A. Factual background

### 1. PFAS

According to Plaintiffs, forever chemicals are "man-made," "not naturally occurring," and "indisputably synthetic chemicals." *Lowe* Am. Compl. ¶¶ 44-45; *Mack* Am. Compl. ¶¶ 46-47. These substances' hydrophobic properties "make tampons more absorbent by drawing liquid into the products' absorbent core and preventing wicking and leakage." *Lowe* Am. Compl. ¶¶ 46-47; *Mack* Am. Compl. ¶¶ 47-48. Plaintiffs allege that "all PFAS are harmful" and "can be harmful even at extremely low levels of exposure." *Lowe* Am. Compl. ¶¶ 50-51; *Mack* Am. Compl. ¶¶ 51-52. Plaintiffs further allege that PFAS have been linked to decreased fertility, negative developmental effects in children, increased risk of cancer, liver damage, thyroid disease, adverse impacts on the immune system, interference with hormones, and increased cholesterol levels. *Lowe* Am. Compl. ¶ 54; *Mack* Am. Compl. ¶ 55. Plaintiffs assert that "[t]here is no treatment to remove PFAS from the body," so "experts agree the most effective strategy to decrease risk is to avoid and/or limit exposure to products known to contain PFAS." *Lowe* Am. Compl. ¶ 63; *Mack* Am. Compl. ¶ 64.

---

[1] Edgewell previously moved to dismiss Plaintiffs' original complaints. *Lowe* ECF 25, *Mack* ECF 26. Plaintiffs filed the operative complaints in lieu of opposing those motions. *Lowe* ECF 34; *Mack* ECF 32.

[2] "Plaintiffs" as used herein refers to Brigette Lowe, a former California resident and current Tennessee resident, and Sarah Mack and Yajaira Solano, who are both currently California residents. *Lowe* Am. Compl. ¶ 19; *Mack* Am. Compl. ¶¶ 19-20.

2.     Plaintiffs' testing

Though they allege that "it is impractical, if not impossible for scientists and researchers to test for the presence" of the 12,000+ PFAS currently in existence by using a "targeted analysis method," Plaintiffs also allege that their own "independent third-party testing" confirmed the presence of PFAS in the tampons at issue here. *Lowe* Am. Compl. ¶¶ 10, 68, 70; *Mack* Am. Compl. ¶¶ 10, 68, 70. Plaintiffs tested for "organic fluorine," a substance Plaintiffs describe as "a surrogate or proxy for PFAS chemicals, meaning its presence is indicative that a sample contains PFAS." *Lowe* Am. Compl. ¶¶ 68-69; *Mack* Am. Compl. ¶¶ 68-69. Plaintiffs allege that this organic fluorine analysis is "widely accepted by scientists, researchers, and regulators," and that "the state of California uses [it] to measure PFAS in its regulation of consumer products." *Lowe* Am. Compl. ¶ 74; *Mack* Am. Compl. ¶¶ 71-72.

In each case, Plaintiffs' testing proceeded in two phases. *Lowe* Am. Compl. ¶ 75; *Mack* Am. Compl. ¶ 73. In March 2022, Plaintiffs first tested "the whole finished [t]ampon [p]roduct." *Lowe* Am. Compl. ¶ 75; *Mack* Am. Compl. ¶ 73. In April 2023, Plaintiffs "then conducted a second round of testing . . . , this time analyzing each individual component of the [t]ampon [p]roducts—the absorbent core, the fabric overwrap, the string, and the applicator (where applicable)." *Lowe* Am. Compl. ¶ 75; *Mack* Am. Compl. ¶ 73. Plaintiffs allege that their "testing uniformly showed that the finished [t]ampon [p]roducts contained PFAS." *Lowe* Am. Compl. ¶ 76; *Mack* Am. Compl. ¶ 74.

According to Plaintiff Lowe, based on these testing results, patent applications showing the use of hydrophobic components in Edgewell's tampon products, and known industry practices,[3] "it is reasonable to conclude that the use of PFAS is part of the [t]ampon product's design in order to improve product performance by increasing absorbency and reducing leaks and surface wetness." *Lowe* Am. Compl. ¶ 78. Plaintiffs Mack and Solano make a similar allegation, though

---

[3] Plaintiff Lowe does not specify what these "known industry practices" are. *See generally Lowe* Am. Compl.

3

they rely on the products' "listed ingredients"[4] instead of unspecified "known industry practices." *Mack* Am. Compl. ¶ 78.

### B. Procedural background

Plaintiff Lowe commenced this action on February 24, 2023. *Lowe* Compl. (ECF 1). On the basis of the "reasonable conclusion" described above, Lowe alleges that Edgewell's claims that its o.b. tampons are "100% Organic Cotton," "Free from Chlorine," "Made from 100% certified organic cotton – **from tip to string**," "Responsibly sourced. Free from pesticides," contain "no Fragrances or Dyes," and include "Only what you need, nothing you don't" (collectively, the "Organic Representations") are false and misleading. *Lowe* Am. Compl. ¶¶ 5-7, 35-37 (emphasis in original).

Plaintiffs Mack and Solano also filed suit on February 24, 2023. *Mack* Compl. (ECF 1). They too rely on the above-described conclusion in alleging that, as to the Playtex Gentle Glide tampons, the use of "SIMPLY" in the name "Playtex SIMPLY gentle glide," the representations that the tampons are "SIMPLE. GENTLE. RELIABLE[,]" "free from colors, dyes, and BPA," and contain "purified fibers," and the assurance that "Every ingredient used in Simply Gentle Glide is rigorously evaluated to provide reliable protection that you can trust to be gentle and safe for your body" (collectively, the "Safe, Gentle, and Purified representations") are false and misleading. *Mack* Am. Compl. ¶¶ 5-6, 37-39.

Plaintiffs seek to represent the following three putative classes:

- Nationwide Class: "During the fullest period allowed by law, all persons who purchased the [t]ampon [p]roducts in the United States within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated."

- Multi-State Consumer Protection Class: "During the fullest period allowed by law, all persons who purchased the [t]ampon [p]roducts in the States of California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Washington within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated."

---

[4] The listed ingredients include "rayon and/or cotton fiber, polyester, polysorbate 20, wax blend (paraffin, butyl sherate, and carnuba wax) and polymer wax dispersion." *Mack* Am. Compl. ¶ 39.

- California Class: "During the fullest period allowed by law, all persons who purchased the [t]ampon [p]roducts in the State of California within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated."

*Lowe* Am. Compl. ¶¶ 152-154 (footnotes omitted); *Mack* Am. Compl. ¶¶ 161-163 (footnotes omitted). Plaintiffs assert the following claims in each case: (1) violation of consumer protection statutes (under the laws of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington), (2) violation of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*, (3) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, (4) violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, and (5) "unjust enrichment/quasi-contract." *Lowe* Am. Compl. ¶¶ 164-172, ¶¶ 173-193, ¶¶ 194-204, ¶¶ 205-216, ¶¶ 217-223 & n.66; *Mack* Am. Compl. ¶¶ 173-181, ¶¶ 182-202, ¶¶ 203-215, ¶¶ 216-227, ¶¶ 228-234 & n.61.

On July 7, 2023, Edgewell filed a motion to dismiss in each case, with an accompanying request for judicial notice. *Lowe* Mot. (ECF 37), *Lowe* RJN (ECF 38); *Mack* Mot. (ECF 38), *Mack* RJN (ECF 39). Edgewell seeks dismissal of each complaint in its entirety because Plaintiffs (1) have not plausibly alleged that the products contain PFAs and have not plausibly alleged that the products contain PFAs that are harmful, and thus fail to state a plausible claim for relief, (2) lack Article III standing, (3) fail to meet Rule 9(b)'s heightened pleading standard, (4) do not allege representations that would mislead reasonable consumers (5) do not allege that Edgewell had a duty to disclose PFAs, (6) cannot plead a claim for unjust enrichment where there is an adequate remedy at law and where it is not actionable as a stand-alone cause of action, (7) assert claims that are expressly or impliedly preempted, and (8) lack standing to assert claims based on laws of states other than California. *Lowe* Mot. at 9-22; *Mack* Mot. at 9-21. Plaintiffs filed their oppositions to the motions on August 4, 2023. *Lowe* Opp. (ECF 46); *Mack* Opp. (ECF 45). They also filed oppositions to Edgewell's requests for judicial notice. *Lowe* RJN Opp. (ECF 47); *Mack* RJN Opp. (ECF 46). Edgewell filed replies in support of its motions to dismiss on August 18, 2023. *Lowe* Reply (ECF 48); *Mack* Reply (ECF 49). It also filed replies in support of its requests for judicial notice. *Lowe* RJN Reply (ECF 49); *Mack* RJN Reply (ECF 50).

      Following the close of briefing, Edgewell submitted three statements of recent decision in each case.  *Lowe* ECF 52, 53, 54; *Mack* ECF 53, 54, 55.  Plaintiffs then moved for leave to respond to Edgewell's supplemental authority, noticing that motion for hearing on January 25, 2024.[5]  *Lowe* ECF 55; *Mack* ECF 56.  The Court vacated the hearing and indicated that counsel could address the supplemental authority during the anticipated January 18, 2024 hearing on the motions resolved by this order.[6]  *See Lowe* ECF 58; *Mack* ECF 59.

## II.    LEGAL STANDARD

      Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

      To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the plaintiff's complaint "'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)).  In ruling on the motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

      "[A]llegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  The court may dismiss a claim "where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim."

---

[5] Going forward, such motions should be filed as administrative motions pursuant to Civil L.R. 7-11.  *See Michael Taylor Designs, Inc. v. Travelers Prop. Cas. Co. of Am.*, 761 F. Supp. 2d 904, 909 (N.D. Cal. 2011).

[6] Having vacated the January 18, 2024 hearing, the Court revisits its prior order and now denies the motion as moot.

*Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside Healthcare Sys., LP,* 534 F.3d 1116, 1121 (9th Cir. 2008)).  "[T]he non-conclusory 'factual content' and reasonable inferences from that content must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

## III.  DISCUSSION

Dismissal is appropriate here because, as Defendants argue, Plaintiffs do not plausibly allege that Edgewell's tampon products contain forever chemicals.  Plaintiffs' limited allegations on that issue are as follows:

| *Lowe* | *Mack* |
|---|---|
| 10.  However, despite Edgewell's consistent and pervasive marketing of the Tampon Products as Organic, Plaintiff's independent testing has shown that the Tampon Products contain per- and polyfluoroalkyl substances ("PFAS"), a category of human-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns. | 10.  However, despite Edgewell's consistent and pervasive marketing of the Tampon Products as Safe, Gentle and Purified, Plaintiffs' independent testing has shown that the Tampon Products contain per- and polyfluoroalkyl substances ("PFAS"), a category of human-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns. |
| 68.  Plaintiff sought independent third-party testing to confirm the presence of PFAS chemicals in the Tampon Products. | 68.  Plaintiffs sought independent third-party testing to confirm the presence of PFAS chemicals in the Tampon Products. |
| 69.  Plaintiffs [*sic*] testing utilized total organic fluorine (TOF) analysis, which is an accepted method for detecting PFAS.  Organic fluorine is a surrogate or proxy for PFAS chemicals, meaning its presence is indicative that a sample contains PFAS. | 69.  Plaintiffs['] testing utilized total organic fluorine (TOF) analysis, which is an accepted method for detecting PFAS.  Organic fluorine is a surrogate or proxy for PFAS chemicals, meaning its presence is indicative that a sample contains PFAS. |
| 70.  There are more than 12,000 PFAS chemicals currently in existence.  Accordingly, it is impractical, if not impossible, for scientists and researchers to test for the presence of each of these 12,000 chemicals in any particular sample. | 70.  There are more than 12,000 PFAS chemicals currently in existence.  Accordingly, it is impractical, if not impossible, for scientists and researchers to use a targeted analysis method to test for the presence of each of these 12,000 chemicals in any particular sample. |
| 71.  More importantly, there are only a few dozen PFAS that can be detected using | 71.  More importantly, there are only a few dozen PFAS that can be detected using |

| | |
|---|---|
| validated EPA methods.  Recently scientists were able to build off of existing methods to develop an advanced test which can detect 70 PFAS, but even with this significant advancement, targeted testing can still only detect 0.006% of PFAS in existence. | validated EPA methods.  Recently scientists were able to build off of existing methods to develop an advanced test which can detect 70 PFAS, but even with this significant advancement, targeted testing can still only detect 0.006% of PFAS in existence.  The results of targeted analysis would not, and could not, provide a comprehensive measure of the total quantity of PFAS that may be present in a sample since it would only be able to detect a mere fraction of potential PFAS.  TOF is the only method that can reliably indicate the presence—or absence—of any PFAS.  As a result of the various shortcomings associated with targeted analysis, TOF analysis has emerged as a reliable and efficient way of identifying the presence of PFAS.  Accordingly, TOF analysis has been widely accepted by scientists, researchers, and regulators as a reliable indicator that a sample contains PFAS. |
| 72.  The results of targeted analysis would not, and could not, provide a comprehensive measure of the *total* quantity of PFAS that may be present in a sample since it would only be able to detect a mere fraction of potential PFAS.  TOF is the only method that can reliably indicate the presence—or absence—of any PFAS. | 72.  For example, the state of California uses organic fluorine to measure PFAS in its regulation of consumer products.  *See, e.g.*, Cal. Health & Safety Code §§ 108945 *et seq.* |
| 73.  As a result of the various shortcomings associated with targeted analysis, TOF analysis has emerged as a reliable and efficient way of identifying the presence of PFAS. | 73.  Here, Plaintiffs tested two different samples of the Tampon Products.  Plaintiffs first tested the whole finished Tampon Product in March 2022.  Plaintiffs then conducted a second round of testing in April 2023, this time analyzing each individual component of the Tampon Products— the absorbent core, the fabric overwrap, the string, and the applicator. |
| 74. Accordingly, TOF analysis has been widely accepted by scientists, researchers, and regulators as a reliable indicator that a sample contains PFAS.  For example, the state of California uses organic fluorine to measure PFAS in its regulation of consumer products. *See, e.g.*, Cal. Health & Safety Code §§ 108945 *et seq.* | 74.  Plainitffs' [*sic*] testing uniformly showed that the finished Tampon Products and each of their individual components contained PFAS. |

8

| | |
|---|---|
| 75. Here, Plaintiff[] tested a total of six different samples of the Tampon Products, including those with and without an applicator. Plaintiff[] first tested four samples of the whole finished Tampon Product in March 2022. Plaintiffs then conducted a second round of testing in April 2023, this time analyzing each individual component of the Tampon Products—the absorbent core, the fabric overwrap, the string, and the applicator (where applicable). | 75. These results are further supported by Defendant's patents, which disclose the use of various hydrophobic materials in the Tampon Products. As discussed above, PFAS are frequently used as a treatment or coating on textiles and other materials to make them hydrophobic (i.e., water-repellant). |
| 76. Plaintiffs' [*sic*] testing uniformly showed that the finished Tampon Products contained PFAS. | 76. For example, one patent states that the design of its tampon strings are treated with a "hydrophobic wax" coating to reduce string absorbency and wicking. Yet another patent states that the Tampon Products' "leak shield" is comprised of various layers of hydrophobic materials which divert liquid to the absorbent core of the tampon. |
| 77. Patents issued to Johnson & Johnson prior to Edgewell's acquisition indicate the use of hydrophobic components in the use of its tampons. As discussed herein, PFAS is frequently used as a treatment to make materials hydrophobic, which can improve the function of feminine hygiene products by, among other things, reducing the surface wetness and drawing liquid into the more product's absorbent core. | 77. PFAS has historically been used as a dispersing agent to impart water repelancy on various surfaces, leading to the reasonable conclusion that the "polymer wax dispersion" listed as an ingredient on the Tampon Products' packaging is likely comprised of PFAS. |
| 78. Accordingly, based on Plaintiffs' [*sic*] testing results, patent applications and known industry practices, it is reasonable to conclude that the use of PFAS is a part of the Tampon Products' design in order to improve product performance by increasing absorbency and reducing leaks and surface wetness. | 78. Accordingly, based on Plaintiffs' testing results, the Tampon Products' listed ingredients, and Defendants' patents, it is reasonable to conclude that the use of PFAS is a part of the Tampon Products' design in order to improve product performance by increasing absorbency, reducing leaks, and preventing wicking. |

*Lowe* Compl. ¶¶ 10, 68-78 (footnotes omitted); *Mack* Compl. ¶¶ 10, 68-78 (footnotes omitted).

These allegations are insufficient to state a plausible claim for relief. The testing allegations are cursory, providing no specificity as to the results reached or any other findings that would support Plaintiffs' interpretation of those results. As such, these allegations are devoid of the factual content necessary to nudge Plaintiffs' claims, based on the theory that Edgewell's tampons contain PFAS, from *possible* to *plausible*. Similarly, allegations referencing patent

1  applications or product labels that mention certain tampon components or ingredients are likewise
2  deficient, as Plaintiffs merely speculate that the hydrophobic components mentioned therein *must*
3  or are *likely to* contain forever chemicals because those chemicals are "frequently" used to make
4  materials water-repellant.

5  The cases Plaintiffs discuss in opposition to Edgewell's motions on this point do not
6  compel a different conclusion. In *Warren v. Whole Foods Market California, Inc*., the plaintiffs
7  brought false advertising claims because coffee creamer labeled "Vanilla" and "Naturally
8  Flavored" contained artificial flavoring. No. 21-cv-04577-EMC, 2022 WL 2644103, at *1 (N.D.
9  Cal. July 8, 2022). In that case, the plaintiffs alleged that they conducted testing that detected
10 "atypically elevated levels" of guaiacol, which suggested the presence of "chemically synthesized
11 vanillin" that is not derived from the vanilla plant. *Id.* The plaintiffs included a photocopy of
12 their test results showing ethyl vanillin at a concentration of 2.205 parts per million, a "non-
13 infinitesimal amount" that was "not explained by relation to any other compounds." *Id.* at *5, *7.
14 The plaintiffs also alleged that the specific vanillin detected during their testing was an artificial,
15 synthetic ingredient that was not naturally derived. *Id.* Their allegation that the substance was not
16 naturally derived was based in part, on the related allegation that there was "an absence of
17 expected amounts of key aromatic compounds." *Id.* at *7.

18 No such allegations are present here. The complaints are silent as to the amount of organic
19 fluorine detected and whether that amount is negligible or significant.[7] *See Lowe* Compl. ¶ 76
20 ("Plaintiffs' testing uniformly showed that the finished [t]ampon [p]roducts contained PFAS.");

---

[7] The Court notes Plaintiffs' allegation that "even 'trace' levels of PFAS can pose a risk to humans." *Lowe* Compl. ¶ 52; *Mack* Compl. ¶ 53. While PFAS may be harmful in any amount, Plaintiffs must still plausibly allege that forever chemicals are present in Edgewell's tampon products. Indeed, the cases Plaintiffs discuss in their opposition briefs on this point all allege some level of organic fluorine in the products at issue. *See Warren*, 2022 WL 2644103, at *1 (plaintiffs alleged PFA levels of 2.205 parts per million, a "non-infinitesimal amount"); *Kanan v. Thinx Inc.*, No. CV 20-10341 JVS, 2021 WL 4464200, at *4 (C.D. Cal. June 23, 2021) (plaintiffs alleged PFAS levels "above trace amounts"); *Hamman v. Cava Group, Inc.*, No. 22-CV-593-MMA, 2023 WL 3450654, at *5 (S.D. Cal. Feb. 8, 2023) (plaintiffs alleged heightened levels of organic fluorine).

1  *Mack* Compl. ¶ 74 ("Plainitffs' testing uniformly showed that the finished Tampon Products and
2  each of their individual components contained PFAS."). The complaints contain no allegations
3  about whether the organic fluroine may be indicative of natural sources or is largely, if not
4  exclusively, linked to forever chemicals. *See Lowe* Compl. ¶ 69 (alleging only that "[o]rganic
5  fluorine is a surrogate or proxy for PFAS, meaning its presence is indicative that a sample contains
6  PFAS."); *Mack* Compl. ¶ 69 (same). Nor do the complaints allege whether the presence or
7  absence of any other substance might bolster Plaintiffs' interpretation of their testing's findings.
8  *See generally Lowe* Compl.; *Mack* Compl.

9  Unlike these allegations, those in *Kanan v. Thinx Inc*. included allegations that the
10 defendant's underwear products contained levels of PFAS that were "above trace amounts." *See*
11 2021 WL 4464200, at *4. The plaintiffs in *Hamman v. Cava Group, Inc*. likewise alleged the
12 presence of "heightened levels of organic fluorine" in the defendant's grain and salad bowl
13 products. *See* 2023 WL 3450654, at *5. These cases illustrate that Plaintiffs must allege more to
14 survive the instant motions to dismiss. Because Plaintiffs fail to plausibly allege the presence of
15 PFAS in Edgewell's tampon products, the Court need not reach the remaining grounds upon
16 which Edgewell seeks dismissal.

17 **IV.  CONCLUSION**

18 For the reasons set forth above, the Court GRANTS Edgewell's motions to dismiss.
19 Edgewell's requests for judicial notice are DENIED AS MOOT, as the Court has not considered
20 those materials in reaching its ruling. For the same reason, the Court DENIES AS MOOT
21 Plaintiffs' motions for leave to file a response to supplemental authority.

22 The Court further orders the parties to meet and confer on how to efficiently litigate these
23 related cases and the overlapping matter of *Bounthon v. The Procter & Gamble Company*, No. 23-
24 cv-00765-AMO (filed Feb. 21, 2023). The Court is inclined to stay two matters while one
25 continues. Proceeding in this manner will avoid burdening the Court and the parties with parallel
26 litigation involving overlapping issues, while still giving Plaintiffs, who are represented by the
27 same counsel in all three matters, the benefit of rulings in one case that will inform the other two.
28 The Court will address these matters with the parties at the case management conference currently

set for February 1, 2024.  The parties should include their respective positions on this issue in the joint case management statement due by noon on January 25, 2024.  The Court will set a deadline for a second amended complaint at the case management conference.

**IT IS SO ORDERED.**

Dated: January 12, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN
United States District Judge**

12